05-129

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 4

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ROBERT LYSLE ROSE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 2002-02
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Hooks & Wright, P.C., Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; Tammy K. Plubell, Assistant Attorney General, Helena, Montana

          George Corn, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  October 31, 2007

Decided:  January 13, 2009

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Robert Rose appeals from his 2003 convictions for aggravated kidnapping, assault with a weapon and assault on a peace officer. Rose was found guilty by a jury and judgment entered on June 6, 2003. He appealed and this Court remanded to the District Court to enter findings of fact and conclusions of law relating to the denial of Rose's motion to dismiss for lack of a speedy trial.

¶2 After remand, the District Court held a two day evidentiary hearing on Rose's speedy trial claim and subsequently entered findings of fact, conclusions of law and an order again denying his motion to dismiss for lack of speedy trial. We restate and consider the several issues Rose raises on appeal as follows:

¶3 1) Did the District Court err in denying Rose's motion to dismiss for lack of a speedy trial?

¶4 2) Did the District Court err when it failed to hold a hearing on Rose's complaints of ineffective assistance of counsel?

¶5 3) Did the District Court abuse its discretion in denying Rose's motion for a new trial on the basis that the prosecutor's statements during the State's closing argument denied Rose a fair and impartial trial?

¶6 4) Was Rose's trial counsel ineffective before she was removed, thus requiring a mistrial?

2

## FACTUAL BACKGROUND

¶7     Rose was arrested on January 11, 2002, in Ravalli County following an incident in which he kidnapped a friend and co-worker, Jonathan Kirk Davies at knife point, badly cutting Davies when he tried to escape. Both Rose and Davies required medical attention. Later, upon his release from the hospital, Rose obtained pepper spray inadvertently left in the back of a patrol car and sprayed a law enforcement officer with it when in the Ravalli County Detention Facility.

¶8     The odyssey which occurred between Rose's arrest on January 11, 2002, and his eventual trial which commenced 507 days later, on June 2, 2003, is summarized here as it relates to Rose's claim that he was denied a speedy trial and his claim that he was denied a hearing to address his complaints about his lawyers.

¶9     The day after his arrest on January 11, a complaint was filed in the Ravalli County Justice Court charging Rose with aggravated kidnapping, assault with a weapon and assault on a peace officer. On January 23, the State filed an information charging Rose with these same felony offenses in District Court.

¶10     On February 6, Rose made his initial appearance in District Court with court-appointed counsel, Larry Mansch. When asked if the defense needed further time to enter a plea, Mansch said, "We do, your Honor. We received about 160-some pages of discovery just the other day, and I know that Robert would like more time to review that, so we'd like to reappear next Wednesday, if I could, please." On Wednesday, February 13, Rose appeared with counsel and entered not guilty pleas. The District Court set an

Omnibus Hearing for March 6. At the Omnibus hearing, defense counsel noted Rose's desire to move for a change of venue, and asked for additional time to pursue that option. The court gave the defense until March 27, 2002, to file the motion and stated: "Then it will be on the standard schedule." The court set a status conference for April 10 and a settlement conference for April 18, 2002.

¶11 At the April 10 status hearing, Rose appeared with counsel and requested a continuance of the April 18 settlement conference. The State, represented by Ravalli County Attorney George H. Corn, objected. Corn predicted that Rose would later raise speedy trial problems and requested to proceed to trial with all haste. The District Court granted Rose's motion to postpone the settlement conference until May 2, 2002.

¶12 On April 17, the District Court received the first of several letters from Rose complaining about his legal representation by Mansch. On April 18, the District Court scheduled a special hearing for April 24 to inquire about Rose's complaints. The day before the hearing, the court received another letter from Rose, retracting his complaints against Mansch. Rose then appeared at the hearing on April 24 along with Mansch. He personally advised the court that he was satisfied with his counsel and there was no need for a further hearing on the matter.

¶13 On May 6, the court received another letter from Rose saying he regretted stating in court that he was satisfied with Mansch. On May 30, Mansch, who received Rose's letters only after the court forwarded copies of them to him, wrote the court saying

Rose's letters to the court had not affected his representation and he was unwilling to step down from the case.

¶14 On June 6, Rose sent another letter to the court saying he was far from happy or satisfied with Mansch's assistance. Rose also asked to represent himself *pro se* until he could retain private counsel or until he was appointed different counsel.

¶15 At a status hearing on June 12, Mansch told the court that Rose's letters to the court had not compromised his representation of Rose. The State, again desiring the proper procedure be followed concerning Rose's off again on again complaints about his lawyer and wishing to avoid speedy trial issues, asked the District Court to inquire about the letters written by Rose complaining about his lawyer, and noted that the trial was set to take place in less than two months. The judge asked Rose to state the reasons why he was dissatisfied with Mansch's representation and explained that only then could the court determine if there was a substantial basis for Rose's dissatisfaction. The judge explained that only if there was a valid basis for Rose's complaints, would the court hold a full hearing to determine if Mansch should be replaced. The following exchange then took place:

> Rose: Your Honor, I was wondering if we could maybe postpone this issue until a further time when we can meet with Mr. Corn and discuss some things, and if I still feel there's a problem, could I address the Court at that time.

> State: . . . I'll rearrange my schedule and make sure we get it done. I think I want the record to reflect that this is done on Mr. Rose's request. There could be a speedy trial issue, and I don't want that to be on the State's hook, so that's my concern.

5

> Court: So we'll continue this hearing then until June 19[th] at 9:00 on request of the Defendant.

¶16 On June 19, 2002, a status hearing was held at which Corn said that the State would press ahead and assumed the trial would be held on July 31. By that time, Rose had sent yet another letter to the court regarding Mansch's representation. The State asked that Rose decide whether or not he wanted to proceed with Mr. Mansch, noting he signed no waiver of a speedy trial. The judge asked Rose if it was his wish to have a different attorney, Rose replied, "Yes, I think I would, because things have not run smoothly."

¶17 The District Court specifically told Rose that if a new attorney was assigned to represent him, it would mean the trial would probably be postponed for weeks or even months. Mansch noted that Rose continuously complained about his representation and indicated his willingness to step aside. The District Court, noting it would save time, dismissed Mansch and appointed another attorney, Mr. Dustin Gahagan to represent Rose. The prosecutor, Mr. Corn, made no objection, noting the trial was still scheduled for July 29.

¶18 On July 11, 2002, the defense filed a motion to continue the July 29 trial. Attached to the motion was a handwritten waiver of speedy trial signed by Rose. Reasons cited for requesting the continuance were counsel Gahagan had not been on the case very long, was extremely busy, and needed additional time to prepare the defense. Rose sent a letter to the District Court on July 13, 2002, requesting postponement of the

6

July trial saying he had hoped not to have to waive his right to a speedy trial but due to the lack of preparation by present counsel, he was left with no other option.

¶19 Six days later, Gahagan moved to substitute a different attorney as counsel for Rose due to the change in the public defender contract with Ravalli County. On July 22, 2002, the District Court appointed Kelli Sather as Rose's attorney. The District Court granted Rose's motion for further delay caused by his request for a different lawyer and reset the trial for November 18, 2002.

¶20 On October 25, 2002, less than one month before the November trial date, the defense filed a motion for a psychological exam. Three days later, the State filed a motion requesting that the trial proceed as scheduled on November 18. That same day, Rose appeared in court with Sather. Rose told the court he was interested in proceeding *pro se* but did not have a chance to talk to counsel about it enough yet. Sather reiterated the request for a psychological evaluation. The State reiterated its request that trial proceed as scheduled and any delay be attributed to the defense. The court advised Rose an evaluation would further delay trial and asked if he understood. Rose advised the court he understood. The court granted the motion for a psychological evaluation and advised a new trial date would be set after the evaluation was received. Rose requested to proceed *pro se* with consultation from Sather and the court postponed any decision on that matter until completion of the psychological examination.

¶21 On January 31, 2003, Rose wrote to the court requesting a hearing about his complaints about his attorney. On February 12, 2003, Rose appeared with Sather. The

7

District Court inquired about both the status of the psychological examination and Rose's complaints about his attorney. Sather stated the examination was finished and the doctor reported Rose was competent to proceed to trial. Sather further advised that Rose had not yet decided whether he wanted to rely on the psychological evaluation at trial, which would require him to disclose it to the State.

¶22 The court then inquired about Rose's complaints with his representation by Sather as follows:

> Court: . . . Well, Mr. Rose, do you have a problem with Miss Sather's representation?
>
> Rose: . . . We met Monday, as she said, and I feel there's been some confidence restored there, but as I mentioned in my complaint, I felt there's been some due process violations and I would like to make mention of, if the Court would allow me time. If not we can-.
>
> Court: You can't have an attorney and represent yourself at the same time, Mr. Rose. If you want to represent yourself, we can discuss that. If you want to be represented by an attorney, you need to deal with her and she will evaluate your claims and proceed with what she thinks is valid.
>
> Rose: Okay.
>
> Court: Is that clear? So are you dissatisfied with her representation or not?
>
> Rose: I felt that I was. We met on Monday and we have started to address some issues and some concerns that I have had, and I feel if we are allowed to continue in those and spend time together and discuss my other defenses and gathering of evidence, I feel that that confidence – that the competence issue between her and I is fine. I do not have a complaint with her. I told her that. I felt it was a conflict rather with the State of Montana and Ravalli County and providing me with counsel that's real busy, and that's been the issue, and I feel that's where my conflict lies.

8

Court:  You're never going to be appointed an attorney who has only you for a client.

Rose:  I understand, Your Honor. I've never expected that from an attorney.

Court:  These are busy people and that's just part of the situation.

Rose:  I know, Your Honor.

Court:  So right now you are not asking that your attorney be relieved?

Rose:  No, I'm not, Your Honor.

Court:  Okay.

¶23  Rose requested that trial be set.

Rose:  But I do not want to make light of the complaints I had in the letter about representation. I feel I had adequate complaint. We have addressed issues on Monday, and if the Court would like to hear why I made those issues and put something on the record, I'm fine with that. I – but I would like to also say that her representation of me at this point, as of Monday, I feel is fine. We have discussed some due process issue that she's agreed to look at with me, and those were my concerns that were being ignored.

Court:  Okay. Did you—

State:  Your Honor, I did. Thank you. I just wanted to remind the Court that these were the same complaints the Court has heard from Mr. Mansch last May, June and July. Mr. Mansch was ultimately relieved. The Court attempted to address Mr. Rose's concerns, and it seems like we're back to the same spot as eight months before. The matter has been set for trial twice. Witnesses have been subpoenaed, interviewed. I think that I'd respectfully request the Court impose some deadlines, not too quick, since we have witnesses out of town, but it sounds like Mr. Rose is heading down the same path. He's going to attempt to fire present counsel, would be my prediction, so I would ask that the Court put some deadlines. It would take us probably a month to five weeks, just because we have witnesses that are out of the county that we have gone through

the process of contacting and lining up before, but I think the deadlines are necessary, given the history of the case.  Thank you, Judge.

Court:  Are we ready to set this for trial, then?

Sather: Your Honor, yes, I believe we are.  And if I could have until tomorrow to make a final decision, as I stated, with Mr. Rose about the disclosure of Dr. Davis's report and whether we're going to use that at trial as a defense or not.  We're still planning on going to trial, so yes, I think setting a trial date is fine at this point.

State:  My only caveat to that is if they do use Dr. Davis's, we may have to request some more time, ironically enough, to see if we agree with that and have that scrutinized by the State's expert.

Court:  The soonest we could set it would be probably in May.

Rose:  Your Honor, may I make a response to the State's accusations of frivolous matters pertaining to my complaint here today?  The State responded to me –

Court:  You know, I –

Rose:  I would like some –

Court:  No disrespect to Mr. Corn, but he's saying what he has to say, and we just don't have the time to get into this back and forth here, and it's not going to do your case any good anyway.

¶24     Two days later, on February 14, 2003, Sather filed notice of Rose's intent to introduce evidence of his mental disease or defect at trial. On February 18, 2003, the court scheduled a jury trial to begin May 12.

¶25     On March 11, 2003, Rose wrote another letter directly to the judge, questioning the fairness of the presiding judge and requesting an inquiry into whether his speedy trial rights had been violated.  Three days later the court was forced to reset the jury trial for

10

June 2, 2003, due to conflicts with the court's calendar. Also on March 14, the State moved for a psychological examination of Rose by a doctor of the State's choosing.

¶26 On March 19, 2003, Rose appeared in court with counsel. The judge advised that the State's motion for a psychological examination was granted and Rose's motion for new judge was denied. For the State's expert to perform an evaluation, the State asked the defense to provide the supplemental materials relied upon by Dr. Davis in his evaluation of Rose. The defense failed to expeditiously provide that discovery.

¶27 On March 25, 2003, Rose again wrote directly to the court complaining of issues he felt his attorney was failing to address.

¶28 On March 28, Rose again sent a letter to the court attempting to make motions on his own behalf to protect his constitutional rights. This letter contained (1) a complaint about court-appointed counsel; (2) an invocation of his speedy trial rights; and (3) a motion for the court to take judicial notice of various evidentiary rules.

¶29 On April 8, 2003, the State moved to bar evidence of Rose's mental disease or defect because the defense failed to produce the discovery related to the evaluation after the court had ordered its production. The State attached to its motion a letter written by Rose to the court and Sather. The letter contained questions regarding his constitutional rights and criticizing County Attorney Corn for failing to protect his constitutional rights.

¶30 On April 16, 2003, Rose filed a *pro se* Petition for Writ of Habeas Corpus, raising issues regarding his representation and his speedy trial rights. Rose then appeared with

11

counsel in court. The State made sure that Rose's complaints about court-appointed counsel were addressed:

> State: And thirdly your Honor, the third thing is Mr. Rose has been sending letters to the Court regarding dissatisfaction with counsel and the system in general. The State's concern is that that may need to be addressed at some point before the trial. What I don't want to happen is we have to reschedule three times. Mr. Rose has been through several attorneys, and if he intends to represent himself with Miss Sather as standby attorney or something, that needs to be sorted out before we get up to the eve of trial. I'm afraid, because there are quite a few subpoenas we have to send out, I would hate to see trial derailed again. And given the tenor of the letter that I received last week that I had to send to the Court and Miss Sather, it particularly concerns me. He wrote me directly. I sent a copy to the Court and I sent one to Miss Sather, and that's one reason that you may need to set something up so that that is all settled before you get closer to trial, Your Honor.

> Court: . . . Now, Mr. Rose, are you currently dissatisfied with Miss Sather's representation?

> Rose: I felt that the—that we have a very serious lack of time together. I've prepared a handwritten writ of habeas corpus. I don't know if the Court has jurisdiction here. I would like to ask if it's frivolous to apply in this Court; if not, I would like to – I've got two copies, one for the Court and one for Mr. Corn, if that's feasible to present today. If not, then I understand.

> Court: Well, I couldn't comment on it without seeing it. . . . [Rose hands it to clerk who stamps it. Judge says he'll look at it later.] Maybe what we ought to do here is have another attorney appointed to independently evaluate Mr. Rose's complaints and make a report to the Court as to whether or not a hearing is necessary. . . . [Court determines that Ms. Brownlee has not been involved in the case.] I'll appoint Miss Brownlee, just for the sole purpose of inquiring into your complaints about Miss Sather and determining, in her opinion, if further hearing is warranted on your concerns.

12

¶31 The District Court ordered attorney Sasha Brownlee to inquire into Rose's complaints regarding his current counsel and to report to the court whether Rose's complaints seemed substantial, warranting a hearing. The State meanwhile requested a hearing on the State's motion for sanctions be continued without date until the State had a chance to evaluate a stack of materials that the defense provided 5 days prior.

¶32 On April 30, 2003, Rose appeared with counsel. The State inquired into the investigation by Brownlee to see if Rose's complaints were valid. Rose responded:

> Rose: May I have a minute, Your Honor? Miss Brownlee met with me Friday. We went over some things. She's familiarizing herself with the rest of the matters that we discussed. She said she would get back with me, and so I'm just waiting to hear back from her on that. As I said before, I was dissatisfied at the time that counsel and I have had to get together and discuss matters of the case, and one of those would be that my right to privilege on some of this information is being discussed here today. I wanted some arguments on that and counsel and I, I felt, need some more time to go over the matters of privilege as far as mental evaluation. There's some parts of that that I don't feel have been released in accord with – or have been released lawfully and it was a violation of my privilege. Whether that's true or not, I would like some argument on it, and maybe have some time to look into that.

> Sather: Your Honor, I have looked into that somewhat, and if--I mean, I don't mind setting a hearing on that if we want – at a later date if I find something or if Miss Brownlee finds something. I began to look into it in filing this response.

¶33 On May 23, 2003, ten days before they were to go to trial, Sather, on behalf of Rose, filed a motion to dismiss for a violation of speedy trial rights, arguing he suffered from a 498 day delay, triggering the speedy trial analysis. Rose alleged the entire delay was attributable to the State.

13

¶34 In chambers on June 2, 2003, the day of trial, defense requested a hearing on Rose's speedy trial motion. After some argument, the District Court denied the request for a hearing and the motion to dismiss for lack of a speedy trial. On appeal, this Court remanded for a hearing on the speedy trial issue.

¶35 Trial was held as scheduled. The jury returned a verdict of guilty on all three counts. Rose was sentenced to Montana State Prison. As noted above, Rose appealed and we remanded for a hearing on the speedy trial issue. The District Court held a hearing and thereafter entered its findings of fact, conclusions of law and order denying Rose's motion to dismiss.

## STANDARDS OF REVIEW

¶36 We review the factual findings underlying a district court's speedy trial ruling to determine whether those findings are clearly erroneous. *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, ¶ 119, 167 P.3d 815, ¶ 119. Findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *Ariegwe*, ¶ 119. We review de novo a district court's determination of whether a speedy trial violation occurred because it is a conclusion of constitutional law. *Ariegwe*, ¶ 119; *State v. Johnson*, 2000 MT 180, ¶ 13, 300 Mont. 367, ¶ 13, 4 P.3d 654, ¶ 13.

¶37 *Ariegwe* was decided August 16, 2007, which was after the District Court heard and entered its order denying Rose's motion to dismiss for lack of a speedy trial. The

14

District Court utilized the now superseded analysis set forth in *City of Billings v. Bruce*, 1998 MT 186, 290 Mont. 148, 965 P.2d 866, to reach its decision. In other cases that were on appeal when a district court entered its decision before *Ariegwe*, we remanded for the district court to reconsider its orders applying the *Ariegwe* factors. See *State v. Billman*, 2008 MT 326, 346 Mont. 118, 194 P.3d 58; *State v. Smith*, 2008 MT 7, 341 Mont. 82, 176 P.3d 258; *State v. Madplume*, 2008 MT 37, 341 Mont. 321, 176 P.3d 1071; *State v. Howard*, 2008 MT 173, 343 Mont. 378, 184 P.3d 344. However, as this case was previously remanded for a hearing on Rose's claim that he was denied a speedy trial, the factual record concerning Rose's speedy trial motion is comprehensive and complete, and the District Court has made the necessary findings of fact for application of the *Ariegwe* analysis. A second remand for the District Court to again examine the record and reconsider its decision under *Ariegwe* would further delay a resolution for the parties involved. We conclude that judicial economy and fairness require we analyze the record and District Court's findings of fact and reach the merits of the speedy trial argument. *See ABC Collectors, Inc. v. Birnel*, 2008 MT 35, ¶ 15, 341 Mont. 310, ¶ 15, 176 P.3d 1067, ¶ 15. Therefore, in this singular instance, we have carefully examined and utilized the record to consider the speedy trial issue in this case using the *Ariegwe* analysis.

¶38 Rose argues the judgment must be vacated because the District Court erred in not conducting a hearing to determine whether he was entitled to have his appointed counsel replaced. We will not overturn a district court's decision on a request for the appointment of new counsel absent an abuse of discretion. *State v. Gallagher*, 1998 MT

70, ¶ 10, 288 Mont. 180, ¶ 10, 955 P.2d 1371, ¶ 10. The substitution of counsel is within a district court's sound discretion. *City of Billings v. Smith*, 281 Mont. 133, 136, 932 P.2d 1058, 1060 (1997).

¶39 Rose argues that two segments of the State's closing argument violated his right to a fair trial guaranteed to him by the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution. He makes this argument for the first time on appeal. We may discretionarily review claimed errors—even absent timely objection—which implicate a defendant's fundamental constitutional rights where failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *State v. Daniels,* 2003 MT 247, ¶ 20, 317 Mont. 331, ¶ 20, 77 P.3d 224, ¶ 20.

¶40 Rose discharged his appointed counsel during the trial and proceeded by representing himself with his former counsel standing by. On appeal, he argues his counsel was ineffective before he discharged her. We review claims of ineffective assistance of counsel de novo because they present mixed questions of law and fact. *State v. Parker*, 2007 MT 243, ¶ 10, 339 Mont. 211, ¶ 10, 169 P.3d 380, ¶ 10; *State v. Kougl*, 2004 MT 243, ¶ 12, 323 Mont. 6, ¶ 12, 97 P.3d 1095, ¶ 12.

16

**DISCUSSION**

¶41    *Issue 1.  Did the District Court err in denying Rose's motion to dismiss for lack of a speedy trial?*

¶42    A court presented with a speedy trial claim analyzes and balances four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's responses to the delay; and, (4) prejudice to the accused.  *Ariegwe,* ¶¶ 106-112.

¶43    On remand, the District Court held a two day speedy trial hearing which resulted in a 250 page transcript.  There are also over 150 docket entries leading up to the June 2, 2003, trial date, as well as transcripts from most of the pre-trial hearings.  Also, the parties not only filed their original briefs, but filed supplemental briefs pertaining to the speedy trial issue.  We examined the record and consider the *Ariegwe* factors as follows:

¶44    *Factor One:  Length of the Delay.*

        *A.  The Interval between Accusation and Trial.*

¶45    The speedy trial clock begins to run at the earliest of arrest, indictment, or the filing of a complaint or information. *Ariegwe*, ¶ 42.  Rose was arrested on January 11, 2002, in relation to the charges subsequently filed in District Court on January 23, 2002.  The trial date was June 2, 2003.  The interval between the accusation and trial was 507 days, as found by the District Court on remand.  This delay triggers further speedy trial analysis.

        *B.  The Extent to which the Delay Stretches beyond the Trigger Date.*

¶46    As a speedy trial analysis is triggered, we next consider the extent to which the

17

delay, irrespective of fault for the delay stretches beyond the 200-day trigger date. The delay stretched 307 days beyond the trigger date. As a result, under Factor Two the State's burden is to explain that its delay was not caused by bad faith, negligence or lack of diligence is increased substantially. Likewise, the presumption that pretrial delay prejudiced Rose is increased and the quantum of proof expected of Rose under Factor Four is substantially decreased.

¶47 *Factor Two: The reasons for the delay.*

¶48 Under Factor Two, we determine whether the reasons for the delay weigh for or against the conclusion that Rose's right to a speedy trial was violated. The more delay caused by the State for "unacceptable" reasons (e.g., lack of diligence or bad faith), the more likely the right was violated. The more delay caused by Rose for such reasons (e.g., to avoid being brought to trial), the less likely the right was violated. *See Ariegwe*, ¶¶ 71-72, 108-09.

¶49 On January 11, 2002, Rose made his first appearance in Justice Court and was later scheduled to be arraigned in District Court on February 6, 2002. At his arraignment in District Court, Rose moved to continue for an additional week before he pled so his counsel could review discovery materials, which was granted. Thus, we attribute seven days of delay to Rose.

¶50 On February 13, Rose appeared with counsel and pleaded not guilty. An Omnibus hearing was set for March 6, 2002. At the Omnibus hearing Rose was unprepared and requested a further delay to investigate whether he should move for a change of venue.

18

This delay was granted. The court gave Rose until March 27 to make his motion. Thus we attribute 21 days of delay to Rose. At this time the court also set a settlement conference for April 18.

¶51 On April 10, at a scheduled status hearing, Rose appeared with counsel and moved for a continuance of the April 18 settlement conference. The State objected, arguing it was necessary to press ahead in order to avoid speedy trial issues. However, the District Court granted Rose's motion and set a new settlement conference for May 2. On April 25, the District Court set Rose's trial for July 29. Thus, we attribute only 7 days of delay to Rose for the time between April 18 and April 25 when the District Court set the first trial date.

¶52 As noted in ¶¶ 15 and 16, the District Court held to the July 29 trial date, even though Rose began making complaints about his lawyer until July 11, when Rose moved to continue the trial and filed a waiver of his right to a speedy trial. Based on this motion, the trial was continued from July 29 until November 18, 2002. Thus, an additional 102 days of delay is attributed to Rose.

¶53 We note here that in most cases, once the defendant waived his right to a speedy trial, it is unnecessary to continue with an analysis of whether that right has been violated. However, in this case, the trial was not held as re-scheduled. Thus, we continue with the speedy trial analysis.

¶54 On October 25, 2002, Rose appeared in court with counsel and moved to continue the November 18 trial for the purpose of obtaining a psychological examination to

determine if the defense of mental disease or defect should be raised.[1] At yet another hearing held on October 28, 2002, the State objected to any further delay. It was the State, not Rose, which was concerned with Rose's right to a speedy trial. Rose said he understood that the exam would cause a further delay, but nevertheless desired to proceed with the mental examination. The District Court granted Rose's motion. At this time the court held off on rescheduling the trial until the examination was completed. On February 18, 2003, after the defense received the results of the psychological examination, the court set trial for May 12, 2003. Thus, we attribute an additional 171 days to Rose for the time between November 18, 2002, and May 12, 2003.

¶55    On March 11, 2003, the trial was moved from May 12 to June 2, due to conflicts in the court's calendar. On June 2, 2003, the trial commenced as scheduled.

¶56    Based on our analysis of the record, of the 507 days of delay we attribute 199 days to the State and 308 days to Rose, as detailed above in ¶¶ 48-54.

¶57    Institutional delay is delay that is inherent in the justice system and largely beyond the control of the justice system. This delay is attributed to the state but weighs less heavily against the State than delay caused by lack of diligence or bad faith in the balancing process because it is not delay that the State actively pursued or encouraged. *State v. Atkins*, 277 Mont. 103, 107, 920 P.2d 481, 483 (1996). In this case, all of the delay attributable to the State is institutional delay. The record clearly reflects the State

---

[1]  Rose previously gave the State notice he might rely on the defense of justifiable use of force.

objected to Rose's requests for postponements from the beginning of the process. In this case it was the State, not Rose, concerned with protecting his right to a speedy trial.

¶58 To the contrary, Rose made complaints about his counsel and then withdrew those complaints, only to make the same complaints and again withdraw them. When a defendant makes requests for new counsel and then withdraws those requests only to renew those requests later, requiring a hearing and ultimately resulting in the withdrawal of counsel, the delay caused is appropriately attributed to the defendant. *State v. Ellenburg*, 2000 MT 232, ¶¶ 22-24, 301 Mont. 289, ¶¶ 22-24, 8 P.3d 801, ¶¶ 22-24; *State v. Collier*, 277 Mont. 46, 55-56, 919 P.2d 376, 382-83 (1997). Also, when the District Court inquired into Rose's complaints and explained that, if they were substantial, a hearing would be conducted to decide if counsel should be replaced, Rose said he would proceed. When he again complained about his representation, the District Court carefully explained to Rose that if he wanted new counsel it would cause a delay. Rose accepted the delay and went so far to file a waiver of his right to a speedy trial. Then, after new counsel had time to prepare, and shortly before the trial was set, Rose filed a new request for further delay to advance a new defense, and then again complained about his lawyer's representation. Based on this record, we conclude it was Rose who caused the greater portion of the delay in bringing this case to trial.

¶59 *Factor Three: Response to the delay and assertion of speedy trial right.*

¶60 A defendant must assert his speedy trial right before the case goes to trial in order to assert the right on appeal. The evaluation of Rose's response to the delay must be

based on surrounding circumstances, such as timeliness, persistence and sincerity of any objection to the delay, the reasons for any acquiescence in delay, and his pretrial conduct (as that conduct bears on the speedy trial right). *See Ariegwe*, ¶¶ 79-81. Conduct evidencing a desire to be brought to trial promptly weighs in Rose's favor whereas conduct demonstrating a desire to avoid trial weighs against Rose in the overall balancing. *See Ariegwe*, ¶ 85.

¶61 Rose, in a half-hearted fashion, asserted his right to speedy trial in letters sent directly to the District Court on March 11 and 28, 2003, and in his writ of habeas corpus filed on April 16, 2003. He was also advised on several occasions that his various motions would result in delay of trial, at which time he said he understood but still wanted to make his belated motions even though he knew they would cause delay. He finally filed a formal motion to dismiss for lack of a speedy trial on May 23, 2003, 497 days after he was arrested and 10 days before trial commenced.

¶62 The State's response to the motions for delay indicates its desire to proceed to trial. The State was diligent in its attempt to bring the matter to trial.

¶63 The record in this case shows it was Rose who caused the delay over the objections of the prosecution. In sum, Factor Three tips the balance substantially against dismissal for lack of a speedy trial.

¶64 *Factor Four: Prejudice to Rose.*

¶65 A presumption the accused was prejudiced by a trial delay arises after 200 days. As the length of delay grows beyond 200 days, the prejudice intensifies. *Ariegwe*, ¶ 56.

22

The court must weigh each party's evidence (or lack thereof) in light of this intensifying presumption. *Ariegwe*, ¶¶ 49, 51. Specifically, as the delay gets longer, the accused's duty to show prejudice decreases while the necessary showing by the State of no prejudice simultaneously increases.

¶66 The length of delay in this case is sufficient to raise the presumption of prejudice to the degree that the State must make a highly persuasive showing Rose was not prejudiced by the delay.

¶67 The determination of how much mental and physical discomfort a defendant is forced to endure because of delay between the time of his or her arrest and the trial is a fact intensive inquiry. The factual nature of this determination is a principal reason why the trial courts, who personally see and hear the defendant and other witnesses, should in the ordinary case consider whether a defendant's right to a speedy trial has been violated. However, as noted above, this is not the ordinary case and this Court has a fully developed record which contains the trial judge's findings of fact concerning the degree which Rose personally suffered.

¶68 First, Rose argues his pretrial incarceration was oppressive, noting his weight loss and his grievance forms about the food and temperature at the Ravalli County Detention Center. Next, he argues the delay of his trial caused him substantial anxiety and concern as demonstrated by his nail biting, his mental illness for which he sought treatment, his parents' health problems and divorce, and his loss of work and contact with his daughter. These claims can be considered in light of the District Court's findings of fact.

23

¶69    *i. Oppressive Pretrial Incarceration.*

¶70    In assessing whether the pretrial incarceration in a given case is "oppressive," we consider all of the circumstances surrounding the incarceration. In *Ariegwe*, we identified a number of pertinent circumstances, including the duration of the incarceration, the complexity of the charged offense(s), any misconduct on the part of the accused directly related to the pretrial incarceration (e.g., a demonstrated likelihood to flee the jurisdiction of the court), whether the accused was incarcerated on a separate charge while awaiting trial on the instant charge, and the conditions of the incarceration, such as overcrowding and lack of recreational opportunities, adequate food, climate control, proper medical care, cleanliness, or legal research capabilities. *Ariegwe,* ¶¶ 90-93.

¶71    We agree with the District Court's findings of fact that although Rose's pretrial incarceration was lengthy, neither its length nor the conditions of incarceration were unduly oppressive in light of the very serious offenses with which Rose was charged, Rose's criminal history, and the potential danger Rose's release would pose to others. In addition, there is substantial evidence in the record which supports the District Court's determination Rose received sufficient medical treatment for a hip problem and other medical conditions while he was in detention, including medical appointments with a nurse and a physician, as well as treatment with various pain medications and anti-inflammatory drugs.

¶72 In regard to Rose's complaints that his medical needs were not met, we also agree with the District Court and the United States District Court that the detention staff acted appropriately in their responses to grievances and were reasonably responsive to his mental health needs.[2]

¶73 There is evidence the temperature in the jail was unsatisfactory for a short time. However, the problem was corrected. Considering the particular difficulties Rose suffered while incarcerated we do not conclude the District Court erred in finding that Rose's time in jail was not so uncomfortable that it was "oppressive."

¶74 *ii. The Accused's Anxiety and Concern.*

¶75 "[T]he speedy trial guarantee serves 'to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges,' not to eliminate the disruption altogether." *Ariegwe* ¶ 97 (quoting *United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 1502 (1982). The question is whether the delay in bringing Rose to trial unduly prolonged the disruption or aggravated the anxiety and concern inherent in being accused of a crime. *Ariegwe*, ¶¶ 97, 147.

¶76 Although the length of delay is, in this instance, significant, the State demonstrated Rose was, to say the least, anxious and in mental turmoil before his arrest on these charges. While his incarceration pending trial may have increased his mental unrest, Rose suffered with anxiety and mental illness before his arrest and had refused

---

[2] Rose filed a petition for habeas corpus in the United States District Court, which made a factual determination he was not being ill-treated and denied the writ.

treatment. In fact, it was while he was incarcerated on these charges he finally requested and received treatment.

¶77 Rose claims the delay exacerbated his anxiety and concern because Rose's mother underwent surgery and he was unable to be with her while she was ill. He also claims that being unable to spend more time with his teenage daughter caused additional anxiety and concern. We agree with the District Court while Mrs. Rose's medical condition was undoubtedly a source of anxiety for Rose, there is no evidence this anxiety was any greater than would reasonably be expected for someone who has a family member with a serious medical condition. In regard to his daughter, Rose did not spend much time with her previously, but only claimed he was trying to form a relationship at the time of his arrest. The District Court concluded any anxiety and concern Rose suffered regarding these family relationships may have been caused by his incarceration, but were not unduly aggravated by the delay in his trial. We cannot conclude from the record that the District Court erred in this regard.

¶78 *iii. The Possibility that the Defense will be impaired.*

¶79 The third interest protected in a consideration of prejudice to the defense caused by a delay in trial relates to the accused's ability to present an effective defense. *Ariegwe,* ¶ 98. Impairment of one's defense can be difficult to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. For this reason, affirmative proof of particularized prejudice is not essential to every speedy trial claim. *Ariegwe,* ¶ 99.

26

¶80   Rose argues the delay in bringing him to trial damaged his ability to present an effective defense because cell phone records disappeared, the truck in which the kidnapping took place was no longer available, and various witnesses were no longer available or could not remember certain details of the events in question.

¶81   However, in spite of the delay, the State was able to demonstrate Rose's ability to present an effective defense was not demonstrably impaired.  While incarcerated, Rose had access to at least three lawyers and a private investigator.  While he did not always agree with the tactics and techniques of his attorneys, he had the ability to consult with them, advise them where evidence could be collected, and assist them in preparation for trial.  With the use of his special investigator, Rose was able to secure and preserve any information or evidence which could have been exculpatory.

¶82   Rose's defense, after he decided to forgo the defense of mental disease or defect, was based on justifiable use of force.  There were only two persons present at the time of the altercation between himself and Mr. Davies.  Considering the circumstances, there is no reason to believe that cell phone records he claims are missing or the absence of his pickup would have provided evidence which would tend to exculpate him.  Nor is there any showing that a witness forgot exculpatory evidence.  Likewise, there is nothing in the record revealing what the witnesses Rose claims could not be located could have testified to, nor is there a showing of how their testimony could have been relevant to his defense.

¶83   The District Court concluded Rose was intimately familiar with the legal system and willing and able to assert every possible legal claim available.  This weighs against

27

him when deciding if his defense was impaired, which has been considered by many courts to be the most important factor in this analysis. *Ariegwe*, ¶ 98. *See Barker v. Wingo*, 407 U.S. 514, 532, 92 S. Ct. 2182, 2193 (1972); *State v. Price*, 2001 MT 212, ¶ 28, 306 Mont. 381, ¶ 28, 34 P.3d 112, ¶ 28.

¶84    *iv. Factor Four Summary.*

¶85    In summary, Rose was incarcerated 507 days. However, due to the severity of the crimes and his criminal history, the length of time he was incarcerated does not rise to the level of oppressive. While Rose suggests his medical treatment was not sufficient, we conclude that under these circumstances, he was not unduly prejudiced by lack of medical care. The anxiety Rose suffered existed before his arrest and was not overly aggravated by delay. The anxiety Rose suffered came from the nature of the offenses and the general jail experience, not the delay in bringing him to trial. While the delay may have caused some witnesses to forget some details, there is no evidence this hampered his defense. Nor is there any indication as to how any alleged missing evidence would have been used at trial.

¶86    *Balancing.*

¶87    We next determine whether Rose was deprived of his right to speedy trial in light of the facts of the case and the weight assigned to each of the four factors laid out above. "None of the factors is dispositive by itself; rather, the factors are related and must be considered together with such other circumstances as may be relevant." *Ariegwe*, ¶ 153.

¶88     Factor One weighs in favor of Rose. The period between his arrest and his trial date is 507 days. This is indeed a substantial delay. However, considering the reasons for the delay under Factor Two, the length of the delay does not require that the charges be dismissed. The entire 199 days of delay attributable to the State is institutional delay. The remaining portion of the delay, 308 days, was not only caused by Rose, the State repeatedly objected to his motions for continuances. Thus, we must conclude that Rose's right to a speedy trial was not violated by the length of the delay.

¶89     Considering Rose's desire to proceed to trial, after the greater portion of the delay was incurred, he asserted his right to speedy trial but then delayed the trial by subsequent motions. In sum, Rose's actions were inconsistent with someone who desires to be brought to trial.

¶90     Finally, taking into consideration the crimes for which Rose was being held, the length of time incarcerated cannot be considered oppressive. The mental and physical problems Rose has were not unduly compounded by the amount of time he spent incarcerated.

¶91     Importantly, an examination of the record leads to the conclusion that Rose's ability to defend himself was not impaired by the delay between his arrest and the trial.

¶92     The District Court did not abuse its discretion in denying Rose's motion to dismiss for lack of a speedy trial.

¶93   *Issue 2: Did the District Court err when it failed to hold a hearing on Rose's complaints of ineffective assistance of counsel?*

¶94   Rose alleges the District Court erred in failing to hold a hearing on his complaints of ineffective assistance of counsel.  The right to counsel does not include the right to select an attorney of one's own choosing or to require the particular attorney be appointed.  *State v. Pepperling*, 177 Mont. 464, 472, 582 P.2d 341, 346 (1978).

¶95   We will not overturn a district court's decision on a request for the appointment of new counsel absent an abuse of discretion.  *Gallagher*, ¶ 10.  The substitution of counsel is within the district court's sound discretion.  *City of Billings*, 281 Mont. at 136, 932 P.2d at 1060.

¶96   "A defendant is entitled to a hearing on the issue of ineffective assistance of counsel where the defendant presents a 'seemingly substantial complaint' about effective assistance."  *City of Billings*, 281 Mont. at 136, 932 P.2d at 1060 (quoting *State v. Weaver*, 276 Mont. 505, 511, 917 P.2d 437, 441 (1996)).  The inquiry by the district court is sufficient if the district court considers the defendant's factual complaints together with counsel's specific explanations addressing the complaints.  *City of Billings*, 281 Mont. at 136-37, 932 P.2d at 1060.

¶97   Rose sent letters directly to the judge regarding his concerns with his first court appointed attorney, Mansch.  In response to the first letter, the judge questioned Rose about his current representation.  Rose responded that the problems had been addressed, and no further conversation on the topic was needed:

30

Court: Mr. Rose, we had been here to address your concerns about your attorney. I'm now in possession of a letter received by the court yesterday where you appeared to indicate that you've worked through whatever concerns you have with Mr. Mansch here. Are you currently satisfied with his representation?

Rose: Yes. Your Honor, the complaints I made last week in the letter were some things that I felt that we needed to go over and hadn't gone over yet, and we've started to go over those things and started to work on some of those things, so, you know, that's what I was making reference to in the letter yesterday.

Court: So at this time then there's no need to address the adequacy of your representation; is that correct?

Rose: Yes.

Court: Okay.

¶98 Later, upon receiving another complaint letter from Rose, the judge once again inquired into the matter and Rose responded he still had the same concerns and felt a new attorney was the best option. The judge, following the procedure suggested in *Weaver*, suggested a full hearing to determine if the complaints were so substantial that a different attorney was required. No hearing was held, however, as the lawyer said it would be more efficient for him to step aside. Rose and the District Court agreed.

¶99 Another lawyer, Gahagan, was appointed and represented Rose for about a month before he was replaced by Sather. In January of 2003 Rose began sending letters to the court directly complaining about Sather. On February 12, 2003, the court questioned Rose about his representation by Sather. Rose responded he had concerns with her, but they were beginning to work through those. Rose also explained to the court he was upset with the system in general. Finally, Rose informed the District Court that he

31

simply wanted his concerns to be heard and noted by the court. As the District Court inquired into Rose's complaints and determined that he was in fact happy with counsel, there was no need to conduct a hearing to inquire further. *See Gallagher*, ¶ 15.

¶100 On April 16, 2003, after receiving more letters from Rose complaining about Sather, the District Court appointed another attorney, Sasha Brownlee, to inquire into Rose's complaints.

¶101 After multiple meetings with both Rose and Sather, Brownlee filed a report with the court on May 16, 2003. Brownlee advised the District Court Rose made it clear to her he did not want Sather replaced; rather he wanted her to do things his way. Brownlee also advised the District Court that Sather's communication with Rose was not deficient. Rose did not inform the District Court that Brownlee's conclusions were wrong, nor has he argued on appeal that her advice to the District Court was inaccurate.

¶102 When the District Court asked Rose what his problems with his lawyers were, he voiced no seemingly substantial complaints. When the District Court appointed yet another lawyer to inquire into Rose's complaints about Sather, he told her he did not want her replaced. The District Court did not err in failing to hold a separate hearing to determine if Rose was being effectively represented by counsel. *See Gallagher*, ¶ 15.

¶103 *Issue 3: Did the District Court abuse its discretion in denying Rose's motion for a new trial on the basis that the prosecutor's statements during the State's closing argument denied Rose a fair and impartial trial?*

¶104 Rose alleges two particular segments of the State's closing argument violated his

32

right to a fair trial guaranteed by the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution.

¶105 Rose first objects to the following comment made by the prosecutor near the end of his argument:

> The real question is, and the one reason the defendant took the stand in this particular case and just told you so many untruthful things, is he doesn't think you'll hold him accountable. He doesn't think that you, as members of the community, have the nerve to hold him accountable for his actions. He thinks that if he gets up and tells the big lie, that you're too gullible, you're too naïve, you're too nice to imagine that anyone would do that, and he hopes that by doing that, he will escape his responsibility.

¶106 A prosecutor invades the jury's province and engages in highly improper behavior when an attorney characterizes the defendant or witnesses as liars or offers personal opinions on a witness's credibility. *State v. Racz*, 2007 MT 244, ¶ 36, 339 Mont. 218, ¶ 36, 168 P.3d 685, ¶ 36; *State v. Hanson*, 283 Mont. 316, 326, 940 P.2d 1166, 1172 (1997). However, to properly preserve an issue for appeal the defendant must make a timely objection or it is considered waived. Section 46-20-104 (2), MCA. Rose did not contemporaneously object to this statement and thus the objection was waived.[3] Having failed to object, Rose requests we employ our discretionary plain error review and reverse on this issue.

¶107 Our review of the closing arguments fails to persuade us the prosecutor's comments resulted in a manifest miscarriage of justice, undermined the trial's fundamental fairness, or compromised the judicial process's integrity. We conclude Rose

---

[3] By the time of closing arguments Rose had persuaded the District Court to allow him to represent himself with Sather as stand by counsel.

failed to preserve this argument for appeal and we decline to exercise our discretionary plain error review and do not consider this matter further. *See Racz*, ¶ 36.

¶108 The second statement Rose objects to is about one of the weapons Rose used. In his closing argument the prosecutor said:

> There's no question these things are weapons. There's just no question. We have got a utility knife – we all know this is the same sort of thing that the people that hijack the airplanes that ran into the World Trade Center, this is what they used.

¶109 Rose asserts on appeal that using this language 21 months after the September 11 terrorist attacks was an improper tactic which appealed to the patriotic emotions of the jury. In this instance the prosecutor referred to the type of knife supposedly used in the attacks of September 11 as an example of how a utility knife could be a weapon of which one could reasonably be afraid. Again, Rose did not object to this analogy and our review of the record does not persuade us that the prosecutor's comment resulted in a manifest miscarriage of justice, undermined the trial's fundamental fairness, or compromised the judicial process's integrity and we decline to exercise our discretionary plain error review. *See Racz*, ¶ 34; *State v. Daniels,* 2003 MT 247, ¶ 20, 317 Mont. 331, ¶ 20, 77 P.3d 224, ¶ 20.

¶110 *Issue 4: Was Rose's trial counsel ineffective before she was removed, thus requiring a mistrial?*

¶111 A criminal defendant's right to counsel is guaranteed by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution.

34

The right to counsel means the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984).

¶112 This Court has adopted the two-prong test first enunciated by the United States Supreme Court in *Strickland* for evaluating a defendant's claim of ineffective assistance of counsel. *See e.g. State v. Meza*, 2006 MT 210, ¶ 27, 333 Mont. 305, ¶ 27, 143 P.3d 422, ¶ 27; *State v. Jefferson*, 2003 MT 90, ¶ 43, 315 Mont. 146, ¶ 43, 69 P.3d 641, ¶ 43; *State v. Rose*, 1998 MT 342, ¶ 12, 292 Mont. 350, ¶ 12, 972 P.2d 321, ¶ 12. A defendant who brings an ineffective assistance of counsel claim bears the burden of showing: (1) his counsel's representation fell below an objective standard of reasonableness, and (2) his counsel's failure was prejudicial. *Jefferson*, ¶ 43 (citing *Strickland*, 466 U.S. at 668, 104 S. Ct. at 2052).

¶113 In regard to the first prong of the *Strickland* test – whether counsel's performance was deficient – the inquiry must be "'whether counsel's assistance was reasonable considering all the circumstances.'" *Whitlow v. State*, 2008 MT 140, ¶ 14, 343 Mont. 90, ¶ 14, 183 P.3d 861, ¶ 14 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065). Every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Whitlow*, ¶ 15 (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

¶114 The pertinent inquiry, therefore, is not whether counsel acted because of ignorance or neglect but, rather, whether counsel's conduct fell below an objective standard of

reasonableness measured under prevailing professional norms under the surrounding circumstances. *Whitlow*, ¶ 20.

¶115 Under the second prong of *Strickland*, the defendant must show the existence of a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different. *Jefferson*, ¶ 53 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). The prejudice inquiry focuses on whether counsel's deficient performance renders the trial result unreliable or the proceedings fundamentally unfair. *Jefferson*, ¶ 53 (citing *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069).

¶116 Rose made no claim on appeal his counsel was ineffective by causing the delay between the time he was arrested and the time he was brought to trial.

¶117 Even though Rose discharged his counsel and represented himself, he claims on appeal Sather was ineffective before he discharged her because during voir dire she failed to either properly question, or attempt to remove for cause, a prospective juror who previously worked at the county attorney's office. Rose asserts he is entitled to a new trial, relying on *State v. LaMere*, 2005 MT 118, 327 Mont. 115, 112 P.3d 1005, where defense counsel admitted he was negligent in reviewing a jury questionnaire, and allowed a mother of a paralegal who worked for the prosecutor's office to sit on the jury.

¶118 A defendant is guaranteed an impartial jury by Article II, Section 24 of the Montana Constitution. *LaMere*, ¶ 7. Voir dire in a criminal proceeding requires adequate questioning to assure counsel's ability to challenge a prospective juror for cause.

36

*LaMere*, ¶ 15; *State v. Herrman*, 2003 MT 149, ¶ 23, 316 Mont. 198, ¶ 23, 70 P.3d 738, ¶ 23.

¶119 In this case, defense counsel has not admitted a mistake, as was the case in *LaMere*. In conducting voir dire, the prosecutor listed the witnesses that may be called to testify and then asked if any veniremen knew them. One remarked she knew one of the potential witnesses, a retired detective, because a couple of years previously she had held a temporary position in the county attorney's office. She then stated she would not tend to favor one side or the other and could hear the evidence and decide the case. She stated she would be fair. In her voir dire for the defense, Sather confirmed this potential juror knew the named witness. The juror then stated she also knew the Roses, years previously.

¶120 There is nothing in the record that indicates this juror held any bias or prejudice. She had, years before, worked as a temporary employee in the county attorney's office and was also acquainted with the defendant's family. These facts do not indicate a bias or a prejudice. When there is nothing in the record to indicate a potential juror is biased, this Court does not presume she harbors a bias or prejudice. *Cf. State v. Ibarra-Salas*, 2007 MT 173, ¶ 22, 338 Mont. 191, ¶ 22, 164 P.3d 898, ¶ 22 (stating there is no presumption of juror bias for or against members of any particular racial or ethnic group). The juror, without coaching, affirmatively stated she could be fair, and would hear the evidence and decide the issues presented to her. As there is no record this particular juror had any bias or prejudice, we conclude counsel's assistance did not fall below an

objective standard of reasonableness measured under prevailing professional norms under the surrounding circumstances. *Whitlow*, ¶ 20.

¶121 Finally, Rose takes a shotgun approach and argues under the second prong of *Strickland* he probably would not have been convicted if his counsel inspected and tested blood evidence in Davies' pickup where the offense occurred, because counsel did not object to evidence concerning his use of methamphetamine, and because counsel made no objection to a jury instruction that an intoxicated condition is not an excuse to commit a crime.

¶122 Rose argues the failure to preserve the pickup led to his inability to present blood evidence. Davies testified, and Rose does not deny, both he and Davies suffered bloody injuries in the cab of the pickup. How blood evidence could have been exculpatory remains a mystery.

¶123 Relating to methamphetamine use, after the trial had started, Rose decided to change his defense theory from lack of ability to form the intent to commit an offense because of mental disease or defect, to justifiable use of force. He then discharged his counsel, and proceeded *pro se*. When the State called the victim to testify, he said without objection, Rose was agitated and nervous the day of the offenses, that Rose told him that his girlfriend had spiked his hot chocolate with meth or speed, and that Rose wanted to go to a treatment center. Rose himself testified he was afraid and nervous that day, and also he would have gone to a treatment center. He also testified about his methamphetamine use. On appeal, Rose has not made a cogent argument as to why

38

evidence of his methamphetamine use was error. Even if there were an error in introduction of such evidence, its introduction is attributable to Rose himself, not appointed counsel. Also, considering the evidence introduced, we see no error in giving the instruction concerning voluntary intoxication.

¶124 We conclude appointed counsel's assistance was reasonable considering all the circumstances and did not fall below an objective standard of reasonableness measured under prevailing professional norms. *Whitlow,* ¶ 20.

¶125 Affirmed.

/S/ JOHN WARNER

We Concur:

/S/ W. WILLIAM LEAPHART

/S/ JIM RICE

/S/ SUSAN P. WATTERS
District Court Judge Susan P. Watters
Sitting in for Justice Brian Morris

Justice James C. Nelson, specially concurring.

¶126 I concur in the ultimate results the Court reaches on all four issues, but I do not agree with all of the Court's reasoning. My primary concerns relate to the Court's decision on the speedy trial issue (Issue 1). Thus, I limit my discussion here to that specific issue.

¶127 For one thing, the Court's speedy trial analysis contains a number of factual errors and unsupported legal propositions. The Court also paints extremely one-sided pictures of the circumstances related to Factors Two and Four. For instance, the Court unduly minimizes the conditions of Rose's incarceration and overstates the extent to which Rose caused pretrial delay. Along these same lines, the Court totally ignores the District Court's role in unnecessarily delaying Rose's trial. Lastly, in several instances, the Court misapplies the revised speedy trial test articulated in *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815. Under Factor Two in particular, the Court does not follow the approach we established in *Ariegwe* and repeated in *State v. Billman*, 2008 MT 326, 346 Mont. 118, 194 P.3d 58. *See Ariegwe*, ¶¶ 124-134; *Billman*, ¶¶ 22-30. I address these and other points in the following application of the *Ariegwe* test to the facts of this case.

## FACTOR ONE: THE LENGTH OF THE DELAY

¶128 I agree with the Court's calculation of a 507-day delay between arrest and trial. Opinion, ¶ 45. I also agree that the State's burden to justify the delay under Factor Two is "increased substantially" and that the State must make a "highly persuasive showing" under Factor Four that Rose was not prejudiced by the delay. Opinion, ¶¶ 46, 66. It is important to point out, however, that in *Ariegwe* the delay stretched 208 days beyond the 200-day trigger date for speedy trial analysis, *see Ariegwe*, ¶ 123, while here the delay stretches 307 days beyond the trigger date. In *Ariegwe*, we stated that the State must provide "particularly compelling justifications" for the delay under Factor Two and must make a "highly persuasive showing" under Factor Four that Ariegwe was not prejudiced

by the delay. *Ariegwe*, ¶ 123. Accordingly, the burden on the State in the present case is even heavier under these two factors.

## FACTOR TWO: THE REASONS FOR THE DELAY

¶129 At the outset of discussing Factor Two, I note that my primary disagreement with the Court's analysis is its failure to acknowledge and properly attribute the substantial amount of avoidable delay in this case. As explained below, there are significant blocks of time during which no trial date was set, which in turn created delay for which there was no constitutionally acceptable justification. Such delay certainly cannot be blamed on Rose, as the Court has done. Rather, it must be attributed to the State.

¶130 In this connection, it is necessary to recall the basic principles which dictate our approach under Factor Two. For one, " 'the primary burden' to assure that cases are brought to trial is 'on the courts and the prosecutors.' " *Ariegwe*, ¶ 72 (quoting *Barker v. Wingo*, 407 U.S. 514, 529, 92 S. Ct. 2182, 2191 (1972)). "A defendant has no duty to bring himself to trial; the State has that duty." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190 (footnote omitted); *accord State v. Blair*, 2004 MT 356, ¶ 23, 324 Mont. 444, ¶ 23, 103 P.3d 538, ¶ 23. Moreover, "society has a particular interest in bringing swift prosecutions, and *society's representatives* are the ones who should protect that interest." *Barker*, 407 U.S. at 527, 92 S. Ct. at 2190 (emphasis added). Thus, the Supreme Court has repeatedly held that the prosecutor *and the trial court* have an affirmative constitutional obligation to try the defendant in a timely manner and that this duty requires a good faith, diligent effort to bring him to trial quickly. *See Ariegwe*, ¶ 65.

41

Consistent with these principles, the prosecution bears the burden of explaining pretrial delays. *Ariegwe*, ¶¶ 64-65.

**First Trial Setting:  July 29, 2002 (199 Days of Delay)**

¶131   Rose became an "accused" on January 11, 2002, when he was arrested in relation to the charges ultimately filed in the District Court.  The first trial date set by the District Court was July 29, 2002.  This constitutes a 199-day delay between arrest and the first trial setting.  The District Court attributed this delay to the State as institutional delay.  This Court appears to attribute 35 days of it to Rose.  *See* Opinion, ¶¶ 49-51.  An analysis under *Ariegwe* reveals both to be incorrect.

¶132   The following events occurred following Rose's arrest:

• January 11:  Initial appearance in Justice Court.

• January 23:  Filing of the Information in District Court.

• February 6:  Initial appearance in District Court.  Upon inquiry by the court, defense counsel stated that he had recently received about 160 pages of discovery and needed time to review it before Rose would enter his plea.  The court scheduled entry of plea for February 13.

• February 13:  Rose entered a plea of not guilty.  The District Court scheduled the omnibus hearing for March 6.

• March 6:  Omnibus hearing.  The District Court approved the Omnibus Hearing Memorandum.  In addition, pursuant to its trial procedure, the court ordered Rose and the State to conduct a "face to face settlement conference" on April 18.  The court stated that a trial date would "be set thereafter if necessary."

• April 10:  Status hearing.  Defense counsel requested a continuance of the settlement conference.  The District Court reset the conference for May 2.

• April 24:  Hearing to address Rose's complaints about defense counsel.  At the conclusion of this hearing, the prosecutor and defense counsel advised the court that the case had not been settled.

42

• April 25: The District Court entered an order setting trial for July 29, 2002 (95 days out).

¶133 The 95-day delay between April 25 and the July 29 trial date is attributable to the State as institutional delay. *Ariegwe*, ¶ 68. But the 104-day delay between January 11 (Rose's arrest) and April 25 is another matter. Again, the primary burden to assure that cases are brought to trial is on the courts and the prosecutors, and the trial court itself has an " 'affirmative constitutional obligation' " to make a good faith, diligent effort to bring the defendant to trial quickly. *Ariegwe*, ¶¶ 65, 72. Given these constitutional mandates, there is simply no justification for a trial court's failing to select a trial date at the earliest practical opportunity to do so.

¶134 Notably, in *Ariegwe*, the district court set trial at Ariegwe's arraignment. In *Billman*, the district court issued an order 20 days after Billman's arraignment scheduling the omnibus hearing and setting a trial date. In this case, however, the District Court did not set trial until well after the omnibus hearing. The State offers no justification for delaying until 50 days after the omnibus hearing and 71 days after Rose's arraignment to set a trial date which, as noted, was 95 days out.

¶135 Absent exceptional circumstances, a trial court should be able to select a trial date by the time of the omnibus hearing or promptly thereafter. The purpose of this hearing, which is to be held "[w]ithin a reasonable time following the entry of a not guilty plea but not less than 30 days before trial," is "to expedite the procedures leading up to the trial of the defendant." Section 46-13-110(1), (2), MCA. At this point in time, the parties should have a good idea of whether a trial is "necessary." Indeed, § 46-13-110(3), MCA,

instructs the prosecutor and defense counsel to be prepared to discuss a number of pretrial matters, including the existence of a plea agreement; reliance on certain defenses; intent to seek persistent felony offender status; intent to rely on evidence of other crimes, wrongs, or acts; and change of venue. While a "face to face settlement conference" after the omnibus hearing might ultimately resolve the case, that is beside the point. There is always a risk that the case will *not* be settled, and the speedy trial right prohibits the court from placing that risk on the defendant by refusing to select a trial date until after the conference.

¶136 Here, on March 6, the District Court required the parties to have a "face to face settlement conference" on April 18 and stated that a trial date would be set thereafter, "if necessary." While this procedure may have enabled the court to set only "necessary" trial dates, it conflicted with the court's affirmative constitutional obligation to ensure that criminal defendants are brought to trial expeditiously. Fifty days later, after being apprised by the prosecutor and defense counsel that the case remained unresolved, the court set trial. Presumably, July 29 was the earliest suitable date; however, this does not change the fact that a suitable date roughly 50 days earlier might have been possible had the court not delayed setting Rose's trial.

¶137 The Court asserts that Rose's counsel was "unprepared" at the March 6 omnibus hearing and requested additional time to investigate whether he should move for a change of venue. Opinion, ¶ 50. Conspicuously absent from the Court's discussion, however, is the fact that the prosecutor likewise was "unprepared" and, thus, requested additional time to file his notice under *State v. Just*, 184 Mont. 262, 274, 602 P.2d 957, 963-64

44

(1979), and *State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991). The District Court gave defense counsel until March 27 to file a change of venue motion and gave the prosecutor until March 29 to file his *Just/Matt* notice. Nevertheless, the Court assigns 21 days of delay to Rose. Opinion, ¶ 50. This approach is erroneous for two reasons.

¶138 First, the District Court's policy, as stated in the Omnibus Hearing Memorandum, was not to set a trial date until after the settlement conference, which was slated for April 18. Thus, defense counsel's request for additional time to investigate a change of venue had absolutely no impact on the setting of a trial date in this case. Both his investigation and his motion were to be completed several weeks before the settlement conference was to occur. Consequently, the Court here is doing exactly what we said in *Ariegwe* a court should not do: "consider any actions taken by the State or the accused which do not result in a postponement of the trial date." *Ariegwe*, ¶ 63. Defense counsel's request did not delay Rose's trial; thus, there is no basis for the Court to assign Rose the 21 days of delay.

¶139 Second, and more to the point, neither Rose's request for additional time to investigate a change of venue nor the State's request for additional time to file its *Just/Matt* notice precluded the District Court from setting a trial date. The record reflects that that a three- to four-month delay between setting a trial date and holding the trial was typical for the District Court during this period. Had the court set trial on March 6 for June 10, instead of setting it on April 25 for July 29, 50 days of delay could have been averted. While this might appear to be speculative, the critical point here is that the State has the burden of justifying the pretrial delays, and that burden in this case is "increased

45

substantially" (Opinion, ¶ 46) due to the extent of the delay. Yet, the State has offered no justification for the District Court's waiting until April 25 to select a trial date.

¶140   Based on the foregoing analysis, I conclude that the 199-day delay between arrest and the first trial setting is properly attributed as follows. First, from the January 11 arrest to the March 6 omnibus hearing (54 days): Accepting, for the sake of argument, the Court's assertion that Rose delayed the selection of a trial date by 7 days when he requested time to review discovery before entering his plea (Opinion, ¶ 49), 47 days are attributable to the State as institutional delay and 7 days are attributable to Rose as acceptable delay in preparing his case. *See Ariegwe*, ¶¶ 68-72. Second, from March 7 to April 25 (50 days): Because this delay resulted from the District Court's decision to postpone setting Rose's trial date, for which the State has provided no justification, it is attributable to the State and weighted more heavily than unavoidable delay inherent in the criminal justice system. *See e.g. Ariegwe*, ¶¶ 126-128. Lastly, from April 26 to July 29 (95 days): These days are attributable to the State as institutional delay.

### Second Trial Setting:  November 18, 2002 (112 Days of Delay[1])

¶141   The Court notes that on July 11, 2002, defense counsel filed a motion to continue the trial and included a "waiver" of Rose's right to a speedy trial. Opinion, ¶ 52. Based on this single fact, the Court attributes all 112 days to Rose. Opinion, ¶ 52. While I do not necessarily disagree with the Court that Rose is responsible for some, if not all, of this delay, the question is not as straightforward as the Court's reasoning suggests. For one

---

[1] The Court calculates "102 days." Opinion, ¶ 52. However, the period beginning July 30, 2002, and running through November 18, 2002, spans 112 days.

thing, the Court simply assumes that Rose's supposed "waiver" was valid. Moreover, the Court fails to consider a number of pertinent circumstances related to the continuance.

*Rose's Motion to Continue and "Waiver"*

¶142 Through a series of letters sent to the District Court in April, May, and June 2002, Rose expressed dissatisfaction with court-appointed counsel Larry Mansch. At a status hearing held June 19, Rose stated that he wanted a different attorney, and Mansch indicated that his ability to communicate with Rose had been compromised. Mansch advised the court that he had spoken with Dustin Gahagan about assuming the case, and the County Attorney concurred with this suggestion, stating that "the best thing we could do at this point is relieve Mr. Mansch, appoint Mr. Rose another attorney, with the understanding that trial is set for July 31st [sic]. I think that gives the other attorney time to come up to speed on the case." Accordingly, the court appointed Gahagan to replace Mansch and instructed Gahagan to advise the court if a trial postponement was needed.

¶143 On July 11, Gahagan filed the motion to continue, explaining as follows:

> The undersigned has not been on this case very long and needs additional time to review the evidence and prepare a defense. Defendant has signed a handwritten waiver of his right to a speedy trial and the undersigned will execute and file a more formal waiver in the near future.[2] Another reason for the request is that the undersigned is no longer a part of the "conflict public defender" contract with Ravalli County. Because the undersigned is currently extremely busy, the new "conflict public defenders" have been contacted about taking over this case and they have indicated that they would also need additional time to prepare for trial. County Attorney George Corn has been contacted and does not oppose a continuance.

Attached to the motion was a piece of paper on which a single handwritten statement

---

[2] It does not appear that the "more formal waiver" was ever executed.

appeared: "I Robert L. Rose here by wave [sic] my Right to a Quick and Speedy Trial." This statement was dated July 10.

¶144 On July 12, Rose sent a letter to the District Court in which he explained, on one hand, that "I was hoping not to have to wave [sic] my Right to a speedy trial," but on the other hand, that "I do not feel it is possible for me to have a fair trial if it is not postponed." According to Rose, Gahagan had told him that he (Gahagan) would not have time to prepare for trial.

¶145 On July 19, the District Court sent Rose a letter stating that the motion to continue would be granted. In addition, the court informed Rose that Gahagan "is no longer a contract public defender which may require reassignment of your defense to the new conflict public defenders in the immediate future." Also on July 19, Gahagan filed a motion to substitute Kelli Sather as defense counsel "for the reason that Kelli S. Sather and Sasha Brownlee now have the conflict contract with Ravalli County and all cases need to be transferred to new counsel." The court granted this motion on July 22. On July 29, the District Court entered an order resetting trial for November 18.

¶146 Without citation to any authority, the Court asserts that "in most cases, once the defendant waived his right to a speedy trial, it is unnecessary to continue with an analysis of whether that right has been violated." Opinion, ¶ 53. This statement is patently incorrect. Assuming for the moment that Rose's one-sentence "waiver" is valid, it was attached to a *specific* motion to continue, and nothing in the waiver indicates that Rose intended to waive his right to a speedy trial for *all* pretrial delays. The waiver, rather, was intended (as Rose later confirmed in his July 12 letter) to secure a continuance of the

48

July 29 trial date. The Supreme Court has said that courts "should indulge every reasonable presumption against waiver" and "not presume acquiescence in the loss of fundamental rights." *Barker*, 407 U.S. at 525-26, 92 S. Ct. at 2189 (internal quotation marks omitted). Accordingly, the Court errs in suggesting that Rose's supposed waiver applied to all of the delays in this case. *See United States v. DeLongchamps*, 679 F.2d 217, 219 (11th Cir. 1982) ("The defendants' waivers were manifestly intended to secure a continuance and were submitted for no other purpose. Indulging every reasonable presumption against waiver of the right to a speedy trial, we decline to hold that the waivers extended to other delays in this case." (citations omitted)).

¶147 At a more fundamental level, however, I question the validity of this waiver. It is well-established that "any waiver of one's constitutional rights must be made specifically, voluntarily, and knowingly." *State v. Tapson*, 2001 MT 292, ¶ 25, 307 Mont. 428, ¶ 25, 41 P.3d 305, ¶ 25 (citing *Park v. District Court*, 1998 MT 164, ¶ 36, 289 Mont. 367, ¶ 36, 961 P.2d 1267, ¶ 36, in turn citing *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938), and *State v. Lucero*, 151 Mont. 531, 538, 445 P.2d 731, 735 (1968)). The Supreme Court has "placed the entire responsibility on the prosecution to show that the claimed waiver was knowingly and voluntarily made." *Barker*, 407 U.S. at 529, 92 S. Ct. at 2191. The State, however, has made no effort in the present case to show that Rose's waiver was made knowingly and voluntarily.

¶148 In this connection, Rose contends that he was "forced" to choose between his right to effective assistance of counsel and his right to a speedy trial. He cites *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967 (1968), in which the Supreme Court observed:

49

[The defendant] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.

*Simmons*, 390 U.S. at 394, 88 S. Ct. at 976. Rose also relies on *State v. Blair*, 2004 MT 356, 324 Mont. 444, 103 P.3d 538, in which we agreed with the following argument by defense counsel in support of Blair's speedy trial motion:

"[R]egardless of the fact that I am in fact Mr. Blair's third attorney and that he had two before, he is in no way responsible for that. He's not accountable for that, and certainly is entitled, regardless of personnel changes in the Yellowstone County Public Defender's Office, to a timely and effective representation."

*Blair*, ¶ 22.

¶149 In the present case, according to the report filed by Sasha Brownlee in May 2003, Gahagan asked Rose to sign the purported waiver "as Gahagan was no longer going to work for the county and [Rose] would be assigned new counsel." A defendant, however, cannot be required to waive his right to a speedy trial simply because the public defender contract is changing hands and his new counsel will not be prepared for trial. It is doubtful that such a waiver is "voluntary." Moreover, the defendant certainly should not be blamed for delay caused by personnel changes within the public defender system.

¶150 I accept that Rose's objections to Mansch's representation, which ultimately led to Mansch's replacement on June 19, contributed to the need for a continuance of the July 29 trial date. On the other hand, Rose could not be required to choose between his right to effective assistance of counsel on one hand and his right to a speedy trial on the other. *Simmons*, 390 U.S. at 394, 88 S.Ct. at 976.

50

¶151 Wholly aside from the substitutions of Rose's appointed counsel, another event occurring in early July 2002 bears on the instant discussion. Section 46-11-401(2), MCA, requires the prosecution to "include endorsed on the information or indictment the names of the witnesses for the prosecution, if known." When the prosecutor filed the Information on January 23, 2002, he endorsed ten witnesses:

- RCSO Lt. Bruce Hennell
- RCSO Deputy Zae Hudson
- RCSO Sgt. Kevin McConnell
- RCSO Deputy Steve Holton
- Marcus Daly Hospital employees
- RCSO Detention Officer Lt. Andy Kollmer
- RCSO Detention Center personnel
- John H. Beck
- Geneviere Indreland
- Kermit Indreland

¶152 Although the prosecution may disclose additional witnesses at the omnibus hearing, *see* §§ 46-13-110(3)(e) and 46-15-322(1)(a), MCA, there is no record that such witnesses were mentioned at the March 6, 2002 omnibus hearing in this case. However, on July 8, a mere 21 days before trial, the State filed a motion to add 13 new witnesses to the Information. The following witnesses were listed in the motion:

- Sgt. Detective Pete Clarkson, RCSO
- Detective Sterling Maus, RCSO
- Detective Jim Chinn, RCSO
- Officer Donald Wilks, RCSO
- Officer Rick Hardy, RCSO
- Kirk Davies, Missoula, MT
- Dr. Brett Bender, Marcus Daly ER, Hamilton, MT
- Dr. Frederick M. Ilgenfritz, Marcus Daly ER, Hamilton, MT
- Dr. Walker J. Ashcraft, Marcus Daly, Hamilton, MT
- Mary Wojciechowski, RN, Marcus Daly Hospital, Hamilton, MT

51

&#8226; Brian Finkle, Ph.D., Cameron, MT
&#8226; John Hyslip, Risk Manager, Pathways Treatment Center, Kalispell, MT 59901
&#8226; Mark Dalby, Ravalli County, MT

The District Court granted the State's motion on July 9. Defense counsel filed the motion to continue the trial two days later.

¶153 The prosecutor offered no justification for not endorsing these witnesses sooner, and it is difficult to conceive of a meritorious explanation for why the prosecution apparently was unaware, prior to July 8, 2002, that Kirk Davies (one of the victims of the charged offenses), five members of the Ravalli County Sheriff's Office, and four healthcare professionals from Marcus Daly Hospital had relevant testimony to provide at Rose's trial. In any event, the point here is that even if Mansch had stayed on as Rose's counsel, the State's endorsement of 13 new witnesses 21 days before trial likely would have necessitated a continuance. For this reason, I cannot agree with the State's assertion that "there would have been no delay but for Rose's request for new counsel."

*Conclusion*

¶154 The State must provide particularly compelling justifications for the delay in this case. *See Ariegwe*, ¶ 123. Moreover, "[a]ny delay not demonstrated to have been caused by [Rose] or affirmatively waived by [Rose] . . . is attributed to the State by default." *Ariegwe*, ¶ 65. If these standards are to have any meaning in our speedy trial framework, I cannot agree with the Court that the 112-day delay between the first and second trial settings should be attributed solely to Rose. Opinion, ¶ 52. The State has the burden to show that that Rose's "waiver" was made knowingly and voluntarily, but the State has not done so. The State also has the burden to show that postponement of the July 29 trial

52

date was caused by Rose, but the record is ambiguous on this point. The postponement may have been necessitated by institutional changes in the public defender system, by the prosecution's motion to add 13 new witnesses 21 days before trial, by the replacement of Mansch at Rose's request about six weeks before trial, or by all of these factors.

¶155 The Court makes the valid point that "[w]hen a defendant makes requests for new counsel and then withdraws those requests only to renew those requests later, requiring a hearing and ultimately resulting in the withdrawal of counsel, the delay caused is appropriately attributed to the defendant." Opinion, ¶ 58 (citing *State v. Ellenburg*, 2000 MT 232, ¶¶ 22-24, 301 Mont. 289, ¶¶ 22-24, 8 P.3d 801, ¶¶ 22-24, and *State v. Collier*, 277 Mont. 46, 55-56, 919 P.2d 376, 382-83 (1996)). Yet, the record in this case does not establish that Rose's complaints about court-appointed counsel were meritless. *See Ellenburg*, ¶ 24 (observing that Ellenburg's "meritless" complaints delayed his trial). And to the extent Rose's complaints were made in the legitimate exercise of his right to effective assistance of counsel, he cannot be charged with the resulting delay.

¶156 For these reasons, I conclude that responsibility for the 112 days should be shouldered in part (if not in whole) by the State, given the State's heavy burden to justify the delay and the State's failure to make the proper showings here. That being said, attributing the 112 days to Rose (as does the Court, *see* Opinion, ¶ 52) does not change my ultimate conclusion under Factor Two. Thus, for the sake of argument, I will assume that this delay is attributable to Rose.

**Third Trial Setting: May 12, 2003 (175 Days of Delay[3])**

¶157 On October 25, 2002, defense counsel (Sather) filed a Motion for Psychological Examination. At a hearing on October 28, the District Court advised Rose that the trial would have to be rescheduled if an evaluation was conducted. Rose indicated that he understood this. The court then granted the motion. The court stated, however, that a new trial date would not be set until the evaluation was received.

¶158 Of the 175 days between November 18, 2002 (second trial setting) and May 12, 2003 (third trial setting), the District Court attributed 86 days to Rose and 89 days to the State. The court reasoned that the time it took to complete the psychological evaluation was Rose's responsibility and the time between completing the evaluation and trial was the State's responsibility. The flaw in this reasoning, however, is that these two time periods could have elapsed *simultaneously* had the court promptly rescheduled trial upon granting Rose's motion.

¶159 The first trial date in this case was set on April 25, 2002, for July 29, 2002 (about three months out); the second trial date was set on July 29, 2002, for November 18, 2002 (nearly four months out); and the third trial date was set on February 19, 2003, for May 12, 2003 (almost three months out). Thus, on October 28, 2002, when the court granted the Motion for Psychological Examination and vacated the existing trial date, had the court then set a new trial date, the new date likely would have been sometime in February 2003. (Actually, the prosecutor pointed out during the October 28 hearing that

---

[3] The Court calculates "171 days." Opinion, ¶ 54. However, the period beginning November 19, 2002, and running through May 12, 2003, spans 175 days.

54

"trial dates are already being scheduled in March.") But that did not occur. Rather, the court stated that "I won't set [the trial date] until we get the report in." As a result, there is a significant period of time (October 28, 2002, to February 19, 2003) during which there was no trial date set in this case at all.

¶160 Such delay is unacceptable, and it clearly is not attributable to Rose. As explained above, the trial court shares the duty of assuring that a criminal case is brought to trial expeditiously. This includes maintaining a trial date. Having a pending trial date provides an impetus for the parties to prepare their cases diligently for trial, which in turn lessens the chance of a speedy trial violation. It also creates a favorable situation in which "docket delay" (i.e., delay caused by the reality that trial dates have to be set a number of months in advance) transpires *simultaneously* with the time required by the parties to prepare their cases.

¶161 By waiting until February 19, 2003, to set a trial date, the District Court created needless delay (during which, incidentally, Rose was incarcerated). Had the court, on October 28, 2002, set a trial date for, e.g., March 3, 2003 (about four months out), and had Rose's counsel requested additional time to review the psychological report (which counsel received during the first week of February 2003), then such delay would have been properly attributed to Rose. But Rose was never even given the opportunity to proceed to trial in early March 2003 because the District Court failed to set a new trial date promptly after it vacated the November 18, 2002 trial date.

¶162 This Court attributes the entire 175-day period to Rose on the ground that his Motion for Psychological Examination caused the District Court to vacate the

55

November 18 trial date. Opinion, ¶ 54. Yet, for the reasons just discussed, although Rose's motion caused the court to vacate the existing trial date, the motion did not in any way preclude the court from promptly setting a new trial date. Rather, the court of its own accord decided to allow four months to pass by without a pending trial date in Rose's case. Notably, the parties were ready to proceed in mid-February 2003, but they had to wait an additional three months to go to trial due entirely to the District Court's failure to maintain a trial setting for Rose on the court's docket.

¶163 For these reasons, I conclude that of the 175 days between the second and third trial settings, the 93 days of avoidable delay during which no trial date was set (November 18, 2002, to February 19, 2003) is attributable to the State and weighs more heavily than institutional delay. The remaining 82 days are attributable to Rose.

**Fourth Trial Setting:  June 2, 2003 (21 Days of Delay)**

¶164 This postponement was necessitated by a conflict in the District Court's calendar. The 21-day delay is attributable to the State as institutional delay.

**Summary**

¶165 In sum, the interval between accusation and trial in this case was 507 days. Of that, 306 days (60 percent) are attributable to the State as follows:  163 days as institutional delay, and 143 days as avoidable delay in setting trial dates. The remaining 201 days (40 percent) are attributable to Rose due to his trial preparations. Significantly, there is no evidence of stonewalling on the part of the prosecution. Indeed, on a number of occasions, the prosecution expressed concern about the speedy trial issue and objected to postponing the trial date. On the other hand, given the State's substantially increased

56

burden to justify the delay in this case (Opinion, ¶ 46), and given the amount of delay attributable to the State that could have been avoided, I conclude that Factor Two weighs in Rose's favor, though only slightly.

### FACTOR THREE: ROSE'S RESPONSES TO THE DELAY[4]

¶166 At the outset, I note the Court's assertion that "[t]he State's response to the motions for delay indicates its desire to proceed to trial." Opinion, ¶ 62. As explained in *Ariegwe*, however, the critical question under Factor Three is "whether *the accused* actually wanted to be brought to trial promptly." *Ariegwe*, ¶ 76 (emphasis added). The State's desire to proceed to trial has little, if any, relevance to this question. Rather, we must evaluate *Rose's* responses to the pretrial delays. *See Ariegwe*, ¶¶ 79-81. Conduct evidencing a desire to be brought to trial promptly weighs in Rose's favor, whereas conduct demonstrating a desire to avoid trial weighs against Rose in the overall balancing. *See Ariegwe*, ¶ 85.

¶167 Some of Rose's pretrial letters suggest ongoing frustration about the pace at which defense counsel was investigating and preparing the defense. Yet, many of Rose's actions (such as the repeated about-faces concerning Mansch's representation and the request for a psychological examination in spite of the fact that it would require a trial postponement) suggest that Rose was not overly concerned about the pretrial delays. Likewise, although Rose asserted his right to a speedy trial in a number of court filings

---

[4] The Court captions this factor: "Response to the delay and assertion of speedy trial right." Opinion, ¶ 59. In *Ariegwe*, however, we explicitly "abandon[ed] the 'Assertion of the Right' label" and stated that, henceforth, we would "refer to Factor Three as 'The Accused's Responses to the Delay.' " *Ariegwe*, ¶ 85.

beginning in late-February 2003, the sincerity of these assertions is questionable. *See* Opinion, ¶ 61 (referring to Rose's assertions as "half-hearted"). Considering the totality of Rose's conduct, I agree with the Court that Factor Three weighs in favor of the State.

## FACTOR FOUR: PREJUDICE TO ROSE

¶168 Under Factor Four, we assess whether Rose was prejudiced in the light of the interests that the speedy trial right was designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern, and limiting the possibility that the defense will be impaired. *See Ariegwe*, ¶¶ 86-88. As noted, the State must make a "highly persuasive showing" that Rose was not prejudiced by the delay. Opinion, ¶ 66.

¶169 I generally agree with the Court's analysis under Factor Four (Opinion, ¶¶ 69-85), except with respect to the oppressiveness of the incarceration. Rose was incarcerated at the Ravalli County Detention Center (RCDC) for the entire 507 days between arrest on January 11, 2002, and trial on June 2, 2003. He spent the first seven months isolated in a maximum security cell. He testified in the District Court (during the speedy trial hearing) that he was not allowed contact with other inmates during this period. He was in his cell for at least 23 hours a day, and some days he was not let out of his cell at all. His only human contact was with the guards when they delivered his meals through a food slot. He ate alone in his cell, which was seven feet wide and approximately ten feet long and had a cement floor, a cement ceiling, cinderblock walls, and a stainless steal toilet and sink. The only window was a four inch by four inch piece of glass in the door.

¶170 Rose claims he was placed in isolation despite strong indications that he suffered from existing mental health issues including bipolar disorder. Rose cites *Walker v. State*,

58

2003 MT 134, 316 Mont. 103, 68 P.3d 872, in which we recognized "the psychological harm caused by placing inmates in a severely restrictive setting for nearly 24 hours a day," which can manifest as massive anxiety, acute confusion, paranoia, concentration and memory problems, and aggressive or self-destructive behaviors. *Walker*, ¶ 66. In this connection, Paul Graves, who met with Rose almost weekly as part of the jail ministry, testified that Rose lost around 15 or 20 pounds during his isolation and that the slight limp Rose had when they first met appeared to worsen over this period.

¶171 During the winter months, Rose's cell was "unbearable" in terms of temperature. Rose testified that there were "times you could see your breath in the cell and there was just no relief." He was allowed only one blanket and would "shiver all night long." He also stated that he was threatened with disciplinary action when he plugged a vent that blew cold air into his cell. Cathy Powell, RCDC Commander, acknowledged at the speedy trial hearing that there had been problems with the heating. She testified that these problems have since been remedied.

¶172 The State asserts that "[n]either the length nor the conditions of Rose's pretrial incarceration were oppressive in light of the nature of the charged offenses, Rose's criminal history and Rose's drug history." The Court appears to agree. *See* Opinion, ¶ 71. Yet, even if Rose's pretrial incarceration was necessitated to an extent by the factors set forth in the bail statute (§ 46-9-301, MCA), nothing about the nature of the charged offenses, Rose's criminal history, or Rose's drug history could justify subjecting him for an extended period of time to the conditions discussed above.

59

¶173 Rose was incarcerated for 507 days in a short-term holding facility. He spent the first seven months isolated in a maximum security cell. Considering the duration and conditions of that incarceration, I conclude that the incarceration was oppressive. However, as noted, I agree with the Court that the delay in bringing Rose to trial did not unduly prolong the disruption of his life or aggravate the anxiety and concern inherent in being accused of a crime. Opinion, ¶ 77. Likewise, it does not appear that the delay significantly impaired Rose's ability to present an effective defense. Opinion, ¶¶ 81-83. For these reasons, I conclude that Factor Four weighs slightly in favor of the State.

## BALANCING

¶174 There was a substantial delay of 507 days between Rose's arrest and his last scheduled trial date. A significant portion of that delay (28 percent) was caused by the District Court's delay in setting trial dates. And Rose's incarceration was oppressive due to the conditions of the incarceration and the amount of time Rose was subjected to them.

¶175 On the other hand, there is no evidence of stonewalling by the prosecution. To the contrary, the prosecutor objected to several of the delays in this case. Moreover, Rose is responsible for 40 percent of the delay, and his actions during much of the pretrial period suggest that he was not overly concerned about the delays. Finally, it does not appear that Rose's ability to present an effective defense was significantly impaired by the delay or that the delay aggravated or unduly prolonged Rose's anxiety and concern.

¶176 For these reasons, I reach the same conclusion as the Court: The District Court did not err[5] in denying Rose's motion to dismiss for lack of a speedy trial. I base this conclusion, however, on the foregoing analysis under *Ariegwe*.


/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins the Special Concurrence of Justice James C. Nelson.


/S/ PATRICIA COTTER

---

[5] The Court states that the District Court did not "abuse its discretion" in denying Rose's speedy trial motion, Opinion, ¶ 92, but that is clearly the wrong standard. As we explained in *Ariegwe*, and as the Court acknowledges in ¶ 36 of the Opinion, "whether the defendant has been denied a speedy trial . . . is a question of constitutional law," which we review "de novo," not for abuse of discretion. *Ariegwe*, ¶ 119.